May it please the Court, I think the place to start is with what this case does not involve. It does not involve any utterances by Mr. Moonin. It does not involve any retaliation against Mr. Moonin. It does not involve any excited utterances. It is about allowing control with the one question of this prior restraint. This case involves a district court making the extraordinary finding that a 160-word email from a commanding officer to his employees could constitute... Well, there are other similar cases. We submit that there are not similar cases in which, in the law enforcement context, telling your own employees they should observe the confidentiality policy. This wasn't just the confidentiality policy, though. I mean, that's why we're here. I mean, was it overbroad in terms of what the major was directing? So, I mean, I don't know that it's exactly what you say. I mean, in fact, I think that's where it probably should start. Sure. Because if it was just, hey, we have a confidentiality policy, and then just the official duties, and I guess that's where we are, was it too overbroad in light of the official duties and his ability as a public citizen to be able to speak out on things? Correct, Your Honor. So the question is, is there something about the character of this email, this directive, which we say is confidentiality, that brings it out of the realm of standard employee employee stuff and into the realm of prior restraint? What I don't understand is that you have a confidentiality policy in place, and it simply says, members shall treat the official business of the division as confidential. Information regarding official business shall be disseminated only to those for whom it is intended, and in quotes of the established proceeds. Why is that not enough? That seems to cover the ballpark. Why do you need more than that? The commanding officers who sent the email were just concerned that it wasn't being followed, so they wanted, in their view, to reiterate this. Well, why didn't they just reiterate the confidentiality policy? It seems like they expanded it. So our position is that this, why is this the same thing? So both the policy you mentioned and this email, they're both getting at the same thing. There's no magic word with respect to confidentiality. What the email says, it has a preface which the district courts were to omit it, but which is in our opening brief. It says, in order to ensure an appropriate flow of communication, which seems to me a very fine synonym for the concept of confidentiality. Confidentiality means information goes to them. All they have to do is repeat the confidentiality policy. All they have to do is say that. Remember, we have a confidentiality policy, and we want to urge you to comply with it. And if you don't, there will be repercussions if you do that. They may have, but what is unconstitutional about phrasing it in a different way? It really is the total gag order on people, you know, For example, the confidentiality provision, I assume, was meant to be understood to cover information. But this covers opinion, right? I mean, in other words, you can't say anything, including I don't like our canine policy, even if you provide no information. I would submit, Your Honor, that if you wanted to draft an email that reiterates a confidentiality policy that served that interest, restricting those, restricting Because am I right that this means that you can't express an opinion about the canine policy if you're an employee of the department without divulging anything? No, Your Honor, I don't think that's how it would go. That's what it says. There could be no contact with any non-departmental for the purpose of discussing the program. The business of a canine unit is typically confidential. It says don't talk about our daily business outside of law enforcement channels. Including I think we have a lousy canine policy. Your Honor, I think that the way to look at this, if the inquiry is What's the answer to that? Just to say that you can't go to the newspaper and say, I can't tell you anything, but we really have a lousy canine policy. No, I think you could say that. No, you couldn't under this. I think that any regional officer reading this would have understood that it is a confidentiality policy. I think the fair way to look at this is Let me try to phrase it another way. If the test in this case was, is there something you could have said that would be constitutionally protected, but which under this particular email would seem to be forbidden. No confidentiality policy would survive. If you took this email and you replaced canine and blind officers with law clerks and you replaced canine program and interdiction program with matters pending in chambers I think you'd have exactly what every federal judge enforces with respect. They're all law clerks. The Federal Judicial Center, for instance, publishes a law clerk manual. It says, do not talk about any confidential information outside of chambers. Now, could that be read to say a clerk can't go to the newspaper and say, I think this is a lousy case, this law is bad, the judge is missing. No, maybe you could and maybe that sort of whistleblown would have to be seen as some sort of implicit exception, but this is how confidentiality policies are always written. They don't say, I mean, if you wanted to read this so narrowly, I guess it could be read to say something like, you can't tell your kids where you work. You can't tell your bowling buddies that you have to work on a weekend, but confidentiality policies are always phrased in broad terms. Don't you look at this as written or in context? Because the context, as I understand it, was that there was a raging dispute and people would understand it in terms of what was actually happening at the time, right? That's true. I think that if you want to follow the Clark case in the Seventh Circuit, they said, just look at the text. So in that case, the Seventh Circuit had found that the sheriff had retaliated. And they thought, this is the Clark case, this is the Milwaukee Sheriff's Office that the district court thought was the most significant case. The circuit has found that, they said the sheriff acted childishly, so they had retaliation, but they said nothing in the text of this particular email directive talks about private citizen speech. You have the Clark email text. We submit as indistinguishable from this. But yet, nevertheless, it says, it is the policy that all sheriff's officers are to be confidential. Don't impart it to anyone. It doesn't say anything about, you know, you can't say the sheriff is coming. We're supposed to look at what, you know, evaluate everything that was not specifically prohibited because I'm looking at the language and it says, it clearly states that no direct contact can be made with any unauthorized person. And then it goes on to say that any violation would be in subordination and will be dealt with appropriately. And so I guess we're back at the same, you know, question is how do those statements not bar Mr. Moonen's speech as a citizen and not just as an employee? I mean, I think we all understand that there are certain things as a public employee he would not be able to speak about, you know, and where the confidentiality would be appropriate regarding his duties. But here, this was a bar. And you said this is extraordinary. I mean, well, this seems to be an extraordinary statement that was sent out. It seems to be, to me, I mean, having reviewed a number of these surveys, it seems to be a monster card. I don't know how else you would phrase this. Let's look at the policy in the Milwaukee case and compare it to this one. It seems to me to be night and day, actually, in the sense that that one is, A, keeping official business confidential, don't say anything about anything about the policy. B, there's a difference between keeping things confidential and not expressing an opinion. Then it says that they should not impart to anyone except for those who it's intended, the official business, and no member shall speak on behalf of the organization. It doesn't say nobody should speak, and it doesn't say nobody should express an opinion. It just says you should keep the business confidential and you shouldn't speak on behalf of the organization. So it says exactly what you're saying, wistfully, that this agreement says, i.e., that it deals with official business and confidential information, but this one doesn't do that. I think our email's superior to the Clark one. It's even more constitutionally sound because instead of using the phrase official agency business, which, by the way, is what the Milwaukee County Sheriff's Office happens to use, but there's no significance constitutionally. Instead of saying that, we just went more, we said something more specific, which is the K-9 interdiction program. If that isn't a more specific version of official agency business, I don't know how you would phrase it. Like I say, I mean, you can find hypothetical things in which this would say, well, you can't protect that. That's valid wistfully. But the way the law deals with those things is in retaliation cases. Can I suggest that maybe more productively you could talk about qualified immunity? Sure. I'd be happy to. The district court based its qualified immunity, major types of qualified immunity on the basis of a single case from out of circuit that has never been cited in this circuit, and then actually found handily for the law enforcement agency. The district court only found that this stripped him of qualified immunity by implication. The district court used the phrase by the ambit of the implication shows that this email, by contrast, is unconstitutional. That doesn't seem to be good enough to deprive him of qualified immunity in the second circuit. Let me just quickly address. Well, the one thing that maybe is, when was this policy written? The official policy that it was in the 90s. You mean this email? Yes. Oh, it's February 2011. I see. Okay. The Garcetti point, our Garcetti point, which is our third point, is very simple, which is to say that the district court adapted the Pickering analysis, but Garcetti changed Pickering. Garcetti says before you get to the ballots, you have to ask in what capacity he's making the speech. You may feel that he was making a speech, or he would have made a speech in a private capacity, but the district court not only did not decide in the way we think is wrong, finding his amount of flaws should have taken some facts. The district court did not even consider it. That was not a prior restraint case. Which wasn't Garcetti. That's right. I don't think Garcetti should apply, but the district court did apply Pickering in Garcetti. So if you're going to apply Garcetti, you have to apply all the factors of Garcetti, which the district court didn't do. Mr. Tice testified, I guess, in his deposition that he never intended for the email to be used or interpreted or construed as unconstitutional type of restraint or to limit Mr. Monin's ability to talk about things. I'm just trying to figure out what do we do with that after the fact, sort of justification. At this point, I mean, can we consider that testimony? Tell me how that fits in here. I think it just supports what we've been discussing. You have to read this in context. I think you can look at the text, but if you want to, the larger context is, of course, the testimony from the officers and what they were trying to do. The Pickering analysis, again, requires you to look at what the motive of the law enforcement agency was in sending this. The district court said that's not relevant because it's a prior restraint. So the plaintiffs got their half of Pickering. We didn't get our half of Pickering. Nevertheless, we have all four commanding officers responsible for this email, all testifying that, look, there was a series of leaks that were causing disruption that we had a right and a duty to stop. And so we decided to send this email. And that's what the purpose was. Is there any case in all that talks about whether or not in that prior restraint case, motiving intent is a relevant factor? I haven't found one. No, I don't think it is. But that's the problem, which is to say that this. No, you said it was. That's why you were relying on the evidence. We took the position to brief that Pickering in Pear City, it doesn't make sense to apply the prior restraint, but I'm taking the district court's order on its own terms. The district court applied Pickering. Well, the term prior restraint is, I think, not helpful. But and one of the opinions says that because they're typically prior restraint law deals with judicial restraints. But what you have is a blanket policy. Let's call it that blanket policy law. And so let's take the prior restraint language out of this. Still, there are a number of cases, including in the Seventh Circuit, in which statements of policy of this kind have been in damages actions. I was surprised to find out that these are subject to damages actions, but there are a number of such cases are judged basically on their face, as I understand it. So that doesn't seem to be a question. The question is whether for quality, for qualified immunity purposes, there's a case close enough to this one to put Tyson on it. Right. Well, let me just make one last point about the Clark case. The Clark panel said that the central issue, that's their word, central, was that on the face of this email, even though they knew that it was designed to get at constitutional protected speech, the central issue was that nothing in this email would prohibit them from going outside of it. And I think that's the same thing here. Like I say, this is how confidentiality policies are written. They never say something like, keep information confidential, unless you feel very strongly that the newspaper needs to know about it. That's why I asked the context question. We know that it seems to me that in this instance, the people reading it would have known or would have thought that they were being told not to do what they'd been doing or what they were accused of doing, which was going to the newspaper and other officials and making various accusations about the way this system, this program was operated. Yeah, well, the interesting thing here is that Mr. Moon and his allegations aren't that he tried to go to the newspaper. His allegation is that he didn't and he went. Not whether he did it, but that when he was being accused of having done it, he would understand that they were being told not to do what he was accused of having done. Yes, but the only fair way, it seems, to adjudicate these sorts of issues is to let the complaining officers speak. Let's see what they say. And then let's see how the agency responds. And then we have a case and we have the... It would have been very easy to put a sentence in at the end that said we understand in some circumstances you have a constitutional right to say things and we're not trying to override that and that you didn't say that. But no confidentiality policy does. I mean, that's just not how they're written. They're always very broad. And if he makes constant... If he whistleblows to say that's what he wanted to do and that's what he did, the thing about whistleblowing is you can do it, but you better be right about it. You can say a judge is lazy and incompetent and corrupt, but unless you have good evidence for that, that's not... I don't think the Constitution is going to protect you against discipline. And they thought misinformation was going out. They thought damaging leaks were occurring. And they acted. And this is, I think... I don't know how you could have phrased this email better. I think it's very nicely done. And that's why I pointed out to begin with, this thing is not talking about information as such, necessarily. Talking about their day-to-day duties, the things they do as county and highland officers, don't talk about your day-to-day duties. But it's not saying don't give information. They don't talk about it at all. Outside of authorized shields without preclearance. You've been a great patient. Thank you for letting me trespass. Thank you. Sir. Thank you. Good morning. Still morning. Ken McKenna on behalf of Madeline and the plaintiff. Appellee. It is the letter. The email. That's what this case is. I'm sorry, I didn't hear that. It is a letter. An email form. Right. That is this case. It is the Four Corners. It does speak for itself. It is what it is. And all the appellant has tried to do throughout this case, both at the district court level, in motion, motion, re-motion, argument, briefing here and argument here today, is say the letter says something other than what it says. Well, they say the motive and the intent and the underlying dynamics are relevant considerations. Do you know of any case that really supports that proposition? I do not. In fact, the case law supports the opposite. You take the letter on its face for the content as to what the reader would have gotten having received this letter, not what the misstated intent was or the after the fact. I don't know if it was at that time that you qualified it, maybe in law or standard. I mean, whether motive or intent should be something that can be considered. And with that not entitled, the Office of Dequalifiability was not clear that that was the case. There could be cases where that applies, but the overbroad nature of this communication and let me just say, I mean, you can look at the I'm going to go back a little bit. So what bothers me about this case, and what gives me a little bit of sympathy for his argument that we ought to wait until somebody says something, is that this is not a prospective case anymore. Maybe it was when filed, right? As to this question, it's only a damages action. Is that right? At this point, correct. Right. Has anybody asked what the possible damages are? There have been discussions about what the damages should be or could be, and there's been communication back and forth in that regard, but there has not been a settlement. It seems to me that without any adverse action taken, the damages are nominal $1 damages or something. I totally disagree with that, and I think the other side, based on their prior the mediations that have occurred in this case. The question here that wasn't brought into, which is, are there actually any damages? There are damages. But it's still an issue, this whole prospective speech. I mean, we've been calling it prior restraint. I don't necessarily agree with that in light of what we understand prior restraint to be, but it's kind of a limitation on prospective speech. I guess I'm just trying to figure out how can we be sure that would have been his speech and trying to figure out if there's any case law out there that permits us to consider what he alleges his speech would have been. I'd follow, but I'm not sure that's necessary to inquire as to what his speech would have been. He's being told, and we know the employee, citizen, public need to know and public importance is the issue in the initial analysis before you even get to the piperine analysis on the balance. Is this something? Is he being told, as you stated, Your Honor, that he can't even have an opinion about conduct that's occurring at the Nevada Highway Patrol? Police officers, law enforcement officers, who are conducting unconstitutional searches, breaking the law and doing other conduct, which obviously the public has to know, needs to know, and has a right to know, and that he's aware of this information and is being told, because it is in context of what's going on. There were five news stories about this canine program and illegal activities. It's on videotape that officers are ripping open, poking holes in packages at the UPS Depot so that dogs can smell better when the package comes by so they can get a positive hit. It's on videotape and it was on the news. So we know what it is that he's going to report as his opinion. It all deals with his official duties and his job. The illegal conduct is certainly not part of his official duties. It's the opposite of his official duties. At that point, he is giving information as a public citizen. It's couched, though, in the e-mail, I guess, and maybe in the brief that if there's any violation of any rule, that's part of their official duties to report to their supervisors. So your counsel here across the aisle is saying, oh, this is why he's saying it's better, this statement was better than some of the other statements, because they were trying to limit it to his official duties in the way they styled it. And so I'm just curious, why isn't this subpetentious speech aligned with his official duties? And given that this is still at the summary judgment phase, is this something that would go to the jury to determine whether or not, you know, this is part of his official duties because there does appear to be some overlap? I would answer your question with a question. Read the e-mail. I've read the e-mail. No, I know. You're asking me the question. I have read the e-mail. I understand. No. That's why I'm asking the question. No in capitals. Use capitals. No direct contact. Any communication in capitals. Any non-departmental people in capitals. All communication is restricted. But they're saying take a note of the supervises. They're not saying you can't do anything whatsoever. They're saying to all of your supervisors, tell us what your problems are, your complaints are. Well, that's what they want you to interpret, but it doesn't say talk to your supervisor. It says talk to your supervisors in addition. Just saying all, any, no. You will be punished. I mean, you're threatened with insubordination. That's termination. Mr. McKenna. Yes. Does that overlap with official duties? It does not overlap. What does it not when they're talking? It's over brought. It's beyond his official duties. That wasn't my question. You don't think that part of overlapping is to deal with his official duties? He has official duties as an officer and a K-9 head or et cetera, et cetera, confidentiality of information with him, but that's not what we're talking about. That's what they want to talk about. And they could have done that, but they didn't. They said you can't communicate with anybody about anything, and that includes McKenna. Let's take, the problem is that even with regard to a more estranged confidentiality policy, such as the other one here or such as the one in the Milwaukee case, there are instances, I presume, in which a public employee might be constitutionally privileged to violate it, right? I'm not sure if I caught the end of that. Might be constitutionally privileged to violate it. In other words, if you have a policy that says you cannot impart any information that you learn in your official capacity about the business of this agency, and it's limited to information, it's limited to official communications, it still could be that if you learn in your official capacity that your boss is taking bribes, you would violate the policy, but you still have a constitutional right to do it. Correct, and I guess that's why I was a little concerned about the official capacity element in relation to his public duty, because they could be at the same time. But that privilege would not invalidate the policy, would it? No, of course not. Even though you might violate it and be protected? Yes. And I understand that that's really the argument on the other side of this. What they're saying is, look, you have to have the courage of your convictions. If you believe that there is something that violates this policy, that you have a constitutional right to say, go ahead and say it and test that proposition. Now, what's wrong with that as an approach to a sensible world, which, yes, there is a confidentiality value with regard to many law enforcement and other professional organizations. And certainly there's the possibility of a contractual agreement that you're not going to say anything that goes on here. And the fact is that there may be constitutionally-based exceptions to that. Yes. Because the policy on its face is not valid. Well, it's not a policy. The policy is the confidentiality policy that they all live under. No, what this is is a letter saying we're going way beyond the confidentiality policy. You can't say anything to anybody under no circumstances about anything, way beyond the confidentiality policy, way beyond the employment employee situation. As a public citizen with a public right and a public's need to know about improper, illegal conduct going on within the place that you work, even though you're law enforcement, you can't say anything about it. It doesn't say that it says if you have anything like that. It doesn't tell them to your supervisor for approval. It made a chain of command. It just simply says don't go off and say this to anybody. Come to talk to us first. I mean, what's wrong with doing that? It doesn't say that thereafter you cannot say anything. It says first talk to us, and then we can sit down and chat about it. Well, it says that in one sentence, but in the prior sentences it says don't do it. It doesn't say come and get approval to do it. It says no communication, no direct contact, any policy, all communication. Then it says present it to somebody or ask for permission. My understanding of what it says is present it for approval, and if it's approved, then communication will be accomplished by the appropriate manager or commander if deemed appropriate. In other words, not that you can say it, but they will say it if they think it's appropriate. Why do they still tell you not to say it? For instance, if you have an opinion. They will tell you not to say it. He will say it himself if he thinks it's appropriate. And so let me ask the question. If you had an opinion, you're this officer, and you have an opinion. I'm not desperate to answer the question to see if it's a friendly question. This was a friendly question. I understand it's a friendly question, and I know I'm going to run out of time. We're all talking the same thing, and we're kind of going around a little bit. But, yes, if an officer is aware of some illegal conduct, and he were to take it to a supervisor and say, I think this is a public concern. I want to make a general statement outside the agency that there's an illegal activity occurring. And the supervisor would say, oh, no, don't do that. And then he does it anyway. So would he be protected in the Constitution? Of course he would. It's basic stuff. Should we take a break? Okay. Stay seated. Okay. Okay, go ahead. You didn't miss anything, or I was just getting chastised a little bit. It was kind of what you'd seen already. I think the thing that, obviously, dealing with this case over the years, and Judge Hicks is ruling and appreciating and understanding it, I think the thing that concerned me the most this morning was when counsel said he considered this a garden variety letter, that this would be just garden variety. You can't talk to anybody any time. I guess that concerns me more than even the incident in this specific case, that the state of Nevada, the representative for the Highway Patrol, thinks that you can tell people you can't talk to anybody about anything at any time because we're the Highway Patrol and we will terminate you if you do. And your opinion or your constitutional rights are invalid, and they don't count because your employment is more restrictive than your right as a public citizen to speak out about injustice or wrongdoing. I'm a little shocked by that statement. But the difficult about this and about this whole area is that  and, moreover, there is a managerial authority because of their status as employees on the one hand. On the other hand, there's a strong public interest. In a way, it's a misportrayal to say they're speaking as citizens. They're speaking as citizens because of things they learned as employees. That's what makes their speech valuable and different. Now, in some instances, it might be otherwise. They may just be speaking directly as citizens about things that have nothing to do with their employment. And I think that was where the original cases came from, like Pickering and so on. But as time has gone on, it's really been more like whistleblowers. And so the adjustment is quite close, and that leads to the qualified immunity question, i.e., at what point—I mean, given the fact that there is a fair amount of room for employer control here, but at some point there isn't, was there sufficient notice here? And I think that is so well taken because when we consider our society, and we certainly consider law enforcement uniquely, it is such a closed system that how else would the public get information about the internal— I quit because you're out of time, but I'd still like to hear you tell me what cases you put. Mr. Tice, I noticed that this was an unconstitutional directive. And I think that Judge Hicks covers that in detail, and he goes to just, again, the four corners of the email itself and its overbroadness, and then he makes the statement that any reasonable law enforcement supervisor would know that this is overbroad and beyond confidentiality, beyond the employer-employee restrictions that you could expect. Again, I would—it just struck me every time I look at this email, and I put yellow highlights on it, there's a thing now in Twitter and texting. If you use capital letters, you're yelling. If you text somebody and you use capital letters, you're yelling. So he's yelling the word no. He's yelling the word any communication. He's yelling the word any non-departmental people. He's yelling that you will be punished. I mean, this is extreme. Can I go back to my question? Sure. I mean, the problem is that now the Supreme Court is taking an increasingly rigorous view at qualified immunity in terms of what case would have given you this knowledge. Judge Hicks doesn't really cite any case, does he? I think he takes the cases of the Garci and Garcetti and the Pinkring case, and I think he discusses it in quite a bit of detail. And he seems to focus on those key words again, and they happen to be the words that are capitalized. Any, all, any non-departmental will be punished in subordination. Again, these are, this is an extreme email. And to say it's garden variety is probably the most concerning thing I've heard today. If this is normal and this kind of communication can go out to employees, if they can't talk to anybody about anything at any time, then we have no First Amendment right. Let me ask you, you have Pinkering ballots. Yes. That has to be engaged, correct? Correct. And I'm just curious as to how that really plays out in the context of qualified immunity. Because Pinkering ballots deals with, of course, the government interest, weighing against all these other things. Does that sort of suggest that qualified immunity should be looked at very carefully whenever you're dealing with a Pinkering balancing case? And do you have any Pinkering balancing case which says that there is no qualified immunity when we deal with a prior restraint case? Do we have to deal with Pinkering balancing? I would actually flip that the other way. Justify what you did with qualified immunity. Don't make my client say it's not qualified immunity. How does he say he has qualified immunity when he writes an email that is so overbroad, so in violation of the First Amendment, so in contrast to the public's need to know, so the opposite of someone being able to exercise their opinions and their rights under the First Amendment? How does he say, I didn't know that violated someone's? The interpreter is really dealing with a job-related type of human dynamic. How does this differ from the law? I guess I have a self-interest. My two wonderful law groups came all the way from New York to hear your argument. Just to hear my argument, Your Honor, I'm very excited to have been here. But, you know, I'm just curious about that. I mean, because I assume that my law groups can't say anything bad about Judge Block's behavior, right? Unless you took a bribe and they were a witness to it. I'm not going to say that, Your Honor. Okay, that's what we're talking about. That's the difference. It's not employment. It's not confidentiality. It's not talking about somebody's personal habits. We're talking about illegal, illegal conduct by law enforcement. It's very much a public interest issue. I'm sure you could suggest that. I'm sure they could respect that. However, I don't know if they did it that you would have a right to say they don't have a constitutional right to do what they have a right to do under the First Amendment, which is express their opinions. And, again, we're beyond opinions and who's a good guy and who's bad. We're talking illegal activity. This is not just someone talking out of school about someone's drinking habits or personal habits in the office. We're talking about police officers committing illegal activity, and this letter trying to suppress an officer from bringing that to the public's attention. We are way out of time. Thank you for allowing me. Well, can you just give me a few more minutes? I'll get back to you in five, four minutes. Okay. Thank you, Honor. I appreciate the indulgence. I really do. Quick point. This talk about unconstitutional activity, this is an allegation in their complaint that they never proved. After years of discovery, this unconstitutional conduct, he said it, but it's not true. The point about the whistleblowing, the point about opinion, can you say these things? I think that a court, just like a law enforcement agency, has the power to restrain speech that calls the court or the agency into disrepute. You can go around and say, officers of the Committee on Constitutional Conduct, left and right, but if it's not true, they can act on it. The Supreme Court has said that in the San Diego v. Roe case. You don't have a right to badmouth an agency if you can't prove it. Same thing with your law clerks. Now, if your law clerks say, well, my judge has never read a single brief in his or her life, if that's not true, then you don't have a First Amendment's right to say those types of things. You don't have a First Amendment right to slander, to spread mistruths. In this case, too, this is. I mean, that just colors the discussion. The question is not whether you have the right to spread mistruths. The question is whether you have the right to spread truths. I would say yes. I would concede that you have a First Amendment right to expose unconstitutional conduct by law enforcement agencies. In this case, he alleged it, but they never proved it. It was just unfounded allegations. Let me ask an admitted unfair question. The fact that we're having this rigorous discussion, does that not suggest that qualified immunity should attach in this particular case? I think it suggests that qualified immunity should not attach in this case. I mean, if qualified immunity means… I'm sorry, yes, it should attach. Yes, thank you. Your answer is yes. My answer is yes. The point of qualified immunity, obviously, is every officer has to know this. If every officer knew this, do you think there would be hundreds and hundreds of cases in which a law enforcement officer complains about something his or her department did to him or her? There's never been a case saying that something like this constitutes a presumptively unconstitutional prior restraint. Yes, I think there's an absence of authority for stripping him of qualified immunity. The problem, of course, is that the next time somebody writes a policy, it's going to be a slip. And even assuming that we first held this one unconstitutional, which is just an assumption, and then got to the qualified immunity point and said you have qualified immunity, then the next time they write a policy, it'll be worded differently, and everybody's always going to get qualified immunity. Our concern with jumping to the qualified immunity thing is that it just chips away at the legitimate powers of law enforcement agencies to regulate the flow of information. You're saying you'd rather win on the merits? I would rather win on the merits, Your Honor. And I just would ask just to consider, just because of my last point, that if you have in your mind an instance where the guy is whistleblowing about actual unconstitutional conduct, that's a classic case where he would be protected. But that was an unproven allegation in this case. You do not have a First Amendment right to go say whatever you want about a law enforcement agency. It brings it into disrepute. I know we don't like to talk about these things as sort of a valid interest, but this Court in Dibble v. Chandler, Supreme Court in San Diego v. Roe, has said that a law enforcement agency has a valid interest in ensuring that the public understands fairly what it is they do and what it is they don't do, because it's very hard to have a law enforcement agency when the public doesn't trust it. The Supreme Court said that mistruths about a law enforcement agency impair their mission. Right, but this is – and I'm going to ask you, Mr. Chandler. I mean, the tension here is you're assuming mistruths and he's assuming truths. And if, for example, you have a law enforcement agency that is going around conducting unconstitutional searches and a person who knows about that comes forward, that presumably isn't the public interest here. That's the problem. They made allegations, fairly insignificant, that he alleged this massive sweep of unconstitutional content from searches to misuse of money. All I'm saying is that, conceptually, there is a tension between the interest in it and keeping – an appearance of keeping respect from the community and the question of whether you're entitled to the respect of the community. Yes, Your Honor, there's a tension, so – Thank you. Thank you. Thank you.  Thank you.  Thank you. Thank you. Thank you. Thank you.
judges: Berzon, Murguia, Block